Manny Starr (319778)
Manny@frontierlawcenter.com
Joseph A. Gross (332258)
Joseph@frontierlawcenter.com
Frontier Law Center
23901 Calabasas Road, #2074
Calabasas, CA 91302
Telephone: (818) 914-3433
Facsimile: (818) 914-3433

Attorneys for Plaintiff
MARINO JAIR RODRIGUEZ, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARINO JAIR RODRIGUEZ, an individual; JENNIFER NORRIS MENA, an individual; WILLIAM KENNEDY, an individual; ANNE MARIE RUIZ, an individual; ROBERT RICHARD BIRCHER, an individual; CHRISTOPHER MICHAEL SACIL, an individual; ELIZABETH ALVAREZ SANCHEZ, an individual; JAMES MATTHEW BUCKLEY, an individual; JOHN DAVID ROLLAND, an individual; MARTA MAHEALANI SACIL, an individual; MICHAEL EDWARD POYTHRESS, an individual; and TERRENCE DARBY, an individual<br><br>Plaintiff(s),<br><br>v.<br><br>SANTA CLARA VALLEY TRANSPORTATION AUTHROITY; and SHAW HR CONSULTING, INC.; and DOES 1 to 100, inclusive,<br><br>Defendants. | **CASE NO. 23-cv-01379-VKD**<br><br>SECOND AMENDED COMPLAINT<br><br>1. Violation of FEHA – Religious Discrimination<br>2. Violation of FEHA – Failure to Take All Reasonable Steps Necessary to Prevent Discrimination from Occurring<br>3. Violation of FEHA – Retaliation for Requesting Religious Accommodation;<br>4. Violation of FEHA – Failure to Take All Reasonable Steps Necessary to Prevent Retaliation from Occurring.<br>5. Retaliation in Violation of Labor Code §6310;<br>6. Intentional Infliction of Emotional Distress;<br>7. Declaratory and Injunctive Relief for Violations of the Religious Freedom Restoration Act ("RFRA"); and |

<u>INTRODUCTION</u>

1.      Since the COVID-19 virus landed on our shores, members of both political ideologies have gone to great lengths to politicize a virus that is not registered to either party.

2.      All efforts to curtail the spread of COVID-19, through mask mandates, restrictions on

1  gatherings, and ultimately the vaccine, were similarly politicized.

2  3.     The COVID-19 vaccine itself was politicized to a greater degree than anything else.

3  4.     Many Americans, including employers, began to view opposition to the vaccine as a clear

4  manifestation of political ideology, or anything but a manifestation of religious beliefs.

5  5.     Many Americans, including employers became skeptical of religiously based efforts to

6  avoid receiving the vaccine; some belief systems received more focus and opprobrium than others.

7  6.     The notion that a vaccine's use of fetal cell lines in their development could form the basis

8  of a religious objection to the vaccine was met with ridicule, contempt, and hostility.

9  7.     This hostility generally took the form of questioning whether the allusions to the use of fetal

10  cell lines was religious, or just a convenient excuse to avoid the vaccine for personal reasons; as far

11  as society was concerned, anyone who claimed their objections were sincerely based on the use of

12  fetal cell lines bore the burden of persuasion on the matter.

13  8.     A major argument, frequently made by the public and employers, was that the timing of

14  these objections was too suspect - fetal cell lines have been used in household medications for

15  years, and nobody objected then.

16  9.     Of course, this argument presupposes that an individual *knew* which items had used fetal

17  cell lines, or had even given any thought as to how the use of fetal cell lines might interact with

18  their religious beliefs; most people don't spend their entire existence in deep thought about the

19  ultimate questions of life, they think about those issues when someone brings it to their attention.

20  Since the subject of the use of fetal cell lines did not become mainstream until the COVID-19

21  vaccine, it is only reasonable that people started thinking about that recently.

22  10.     Given how ubiquitous the topic of the COVID-19 vaccine was, it was inevitable that many

23  religious leaders formed, and shared, their opinions about what various religious texts meant in the

24  COVID-19 vaccine context.

25  11.     Regardless of why, the COVID-19 vaccine issue was ripe for explosive confrontation; the

26  topic was on everybody's lips.

27  12.     Seemingly overnight, employers received record breaking requests for religious

28  accommodations from their vaccine requirements on the basis that the COVID-19 vaccine

1    conflicted with an employee's sincerely held religious beliefs.

2    13.    A large swath of these requests for accommodation to COVID-19 vaccine requirements was

3    premised on the notion that the vaccines had utilized, or contained, fetal cells.

4    14.    Viewed through the political-motivation lens, employers became convinced that the

5    massive surge in requests for religious accommodations from their vaccine requirements,

6    particularly those based on the use of fetal cell lines, was proof that people were attempting to

7    mask their political beliefs with religious language; this is the epitome of circular reasoning.

8    15.    As a practical effect then, some religious beliefs were disfavored as too extreme to be

9    sincere, while less "offensive" religious beliefs like days off, headwear, or religious garb were

10    acceptable to the masses.

11    16.    It was equally likely that the surge in requests for religious accommodations from vaccine

12    requirements was a direct result of numerous religious experts providing their expert opinions to

13    their congregants, and the ubiquity of discussions on the subject in society-at-large.

14    17.    Faced with two possibilities, one logical and one predisposed to assume nefarious goals

15    based on political, or non-religious ideology, employers opted to treat all employees who requested

16    religious accommodations from their vaccine requirements, particularly those who based their

17    objection the use of fetal cell lines, as political wolves masquerading in sheep's clothing.

18    18.    As a result of many employers' mistaken beliefs that any request for religious

19    accommodation to their vaccine requirements, particularly those premised on the use of fetal cell

20    lines, were likely motivated by political ideology, employers engaged in a systematic process that

21    was a classic model of confirmation bias; employees were fighting an uphill battle to persuade their

22    employers that the motivation for their requests was religious, and not political as their employers

23    presupposed.

24    19.    The circumstances being what they were, employers began seeking and interpreting

25    information they received in connection with an employee's request for religious accommodation

26    with an eye towards confirming their suspicions that those requests were political in nature.

27    20.    Simultaneously, many 3rd party HR companies identified the slew of requests for religious

28    exemptions to employers' COVID-19 vaccine requirements as a lucrative business opportunity.

21.     Despite an objectively insufficient amount of experience in reviewing employees' religious requests for exemptions from vaccine requirements, many of these opportunistic companies billed themselves as qualified to handle an employers' obligation to engage in a good-faith interactive process in relation to employees' religious requests for exemption from their employer's COVID-19 vaccine requirements.

22.     These 3rd party HR companies suffered from the same confirmation bias discussed above.

23.     After entering into an agency relationship, without any reasonable vetting process, employers blindly followed their unqualified agent's recommendations as it related to their employees' religious requests for exemption from their COVID-19 requirements.

24.     Moreover, many employers directed *all* employee's religious exemption requests to these 3rd party HR companies for a second level of review, notwithstanding the fact that those employers did not have a bona fide belief that the requests themselves were flawed; employers simply subjected those requests to additional scrutiny because the religious exemption requests *might* be based on something other than a sincerely held religious belief.

25.     Thus, employees with a sincerely held religious belief that prohibited them from receiving the COVID-19 vaccine, had their entire religious history placed under a microscope based on nothing more than a generalized concern that those requests were insincere.

26.     The 3rd party HR companies, partially blinded due to a combination of confirmation bias and the general sense that religious requests for exemption from the COVID-19 vaccine were automatically suspect, failed to conduct a proper investigation into the religious requests that employers transmitted to them.

27.     The 3rd party HR companies began asking probing questions, essentially placing an employees' *entire* religious background under a microscope for the sin of taking issue with a vaccine that many previously silent religious entities had voiced an opinion on.

28.     The 3rd party HR companies went too far with those probing questions, essentially creating a system where an employee needed to be a theologian to answer the 3rd party HR company's questions properly and qualify for a religious exemption or accommodation.

29.     Implicit in these probing questions was that the employee *had* to answer, not knowing the

-4-

1    answer to these questions would be ground for rejection of a religious exemption.

2    30.    Many employers simply look for "code words" and dismiss requests for religious

3    accommodation out-of-hand without any serious consideration as to the sincerity of the employees'

4    beliefs.

5    31.    For example, any reference to stem cells or fetal cells automatically flagged a request as

6    being based on "misinformation," despite the fact that the truth of an individual's beliefs is

7    irrelevant, so long as the beliefs are sincerely held; this is true regardless of whether those beliefs

8    are "acceptable, logical, consistent, or comprehensible to others." (*Thomas v. Review Bd. of the*

9    *Ind. Employment Sec. Div.,* (1981) 450 U.S. 707, 714).

10    32.    In many instances, the 3rd party HR companies completely disregarded documentary

11    evidence submitted by employees, which included letters from pastors, friends, and family.

12    33.    In many instances, the 3rd party HR companies demanded that employees waive their right

13    to privacy and authorize them to review their *entire* medical history to see if that employee had

14    *ever* acted inconsistently with their religious beliefs.

15    34.    In short, the employers acting through the 3rd party HR companies pre-determined that

16    many of the requests form religious exemption from their COVID-19 vaccine requirements were

17    insincere, and simply kept digging into a requesting employees' life until they could find *something*

18    to point to as evidence of insincerity.

19    35.    Employers negligently placed their unqualified faith in unqualified 3rd party HR companies

20    and relied on their legally flawed interactive process in determining that their employees would be

21    subjected to adverse employment actions as a result of their refusal to receive the COVID-19

22    vaccine on religious grounds.

23    36.    Blinded to their obligations, employers relied on the 3rd party HR companies' flawed

24    process to convince themselves that their employees were not entitled to reasonable

25    accommodations like weekly testing, social distancing, remote work, or anything else.

26    37.    The net result of the politicization, news coverage, and gamesmanship, of the COVID-19

27    vaccine, was that any opposition to receiving the COVID-19 vaccine was immediately presumed to

28    be based on misinformation or conspiracy theories; opposition to the vaccine based on religious

1  beliefs, or medical conditions, were presumed to be excused to mask a less valid reason for

2  opposition.

3  38.    Ultimately, employers routinely deny legitimate requests for religious exemption from

4  COVID-19 vaccine requirements based on the presumption that all requests are based on improper

5  reasons; employers bolstered this reasoning with questions that would invariably provide them with

6  a colorable claim that the request was insincere.

7  39.    Many employees had a sincerely held religious belief that their religion prohibits them from

8  receiving the COVID-19 vaccine. Employer, acting through the 3rd party HR companies, subjected

9  their employees to probing questions, which were designed to create inconsistent responses and

10  elicit "code word" responses served its purpose; employers rejected employees' requests for

11  religious exemptions to the COVID-19 vaccine requirement.

12  40.    While employers were understandably in a bind when faced with an onslaught of requests

13  for religious accommodation, that does not allow them to utilize methods that have a pre-

14  determined outcome in lieu of a *good-faith interactive* process.

15                                                      PARTIES

16  41.    Defendant SANTA CLARA VALLEY TRANSPORTATION AUTHROITY ("VTA") is a

17  "public agency" pursuant to California Government Code section 3501(c), and has offices at 3331

18  North First Street, San Jose, California 95134. The VTA pays the wages of its employees,

19  including Plaintiffs.

20  42.     Defendant SHAW HR CONSULTING, INC., ("Shaw") is a California corporation doing

21  business in Ventura County.

22  43.     Defendant VTA hired Defendant Shaw to review employee requests for religious

23  exemptions to VTAs COVID-19 vaccine requirement.

24  44.    Defendant Shaw would review VTA employees' requests for religious exemptions to VTAs

25  COVID-19 vaccine requirement and make recommendations as to whether VTA should approve or

26  deny any given request; a denial of a request all but assured that the requesting employee would be

27  threatened with termination or other adverse employment action if they continued to refuse to

28  receive the vaccine.

1    45.    Therefore, Defendant Shaw was an agent of VTA.

2    46.    Therefore, Defendant VTA and Defendant Shaw are jointly and severally liable for the

3    claims alleged herein.

4    47.    At all relevant times, Plaintiff JENNIFER NORRIS MENA ("Plaintiff Mena") was a

5    resident of Santa Clara County.

6    48.    At all relevant times, Plaintiff WILLIAM KENNEDY ("Plaintiff Kennedy") was a resident

7    of Santa Clara County.

8    49.    At all relevant times, Plaintiff MARINO JAIR RODRIGUEZ ("Plaintiff Rodriguez") was a

9    resident of San Francisco County.

10    50.    At all relevant times, Plaintiff ANNE MARIE RUIZ ("Plaintiff Ruiz") was a resident of

11    Santa Clara County.

12    51.    At all relevant times, Plaintiff ROBERT RICHARD BIRCHER ("Plaintiff Bircher") was a

13    resident of San Joaquin County.

14    52.    At all relevant times, Plaintiff CHRISTOPHER MICHAEL SACIL ("Plaintiff C. Sacil")

15    was a resident of Santa Clara County.

16    53.    At all relevant times, Plaintiff ELIZABETH ALVAREZ SANCHEZ ("Plaintiff Sanchez")

17    was a resident of San Joaquin County.

18    54.    At all relevant times, PLAINTIFF JAMES MATTHEW BUCKLEY ("Plaintiff Buckley")

19    was a resident of Merced County.

20    55.    At all relevant times, PLAINTIFF JOHN DAVID ROLLAND ("Plaintiff Rolland) was a

21    resident of Santa Clara County.

22    56.    At all relevant times, PLAINTIFF MARTA MAHEALANI SACIL ("Plaintiff M. Sacil")

23    was a resident of Santa Clara County.

24    57.    At all relevant times, PLAINTIFF MICHAEL EDWARD POYTHRESS ("Plaintiff

25    Poythress") was a resident of Santa Clara County.

26    58.    At all relevant times, PLAINTIFF TERRENCE DARBY ("Plaintiff Darby") was a resident

27    of Stanislaus County.

28    59.    At all relevant times, PLAINTIFF WILLIAM KENNEDY ("Plaintiff Kennedy") was a

1   resident of Santa Clara County.

2   60.    All named Plaintiffs are collectively referred to as "Plaintiffs."

3   61.    Plaintiff does not know the true names and capacities of Does 1 to 100 and therefore uses

4   fictitious names. Plaintiff will amend the complaint pursuant to Code of Civil Procedure section

5   474 to allege the true names and capacities when ascertained.

6   62.    VTA, all named, and unnamed Doe defendants are collectively referred to as "Defendants."

7   63.    Plaintiff is informed and believes that each of the Defendants was the agent or employee of

8   the other Defendants and acted in the scope of agency or employment.

9

10                   PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

11  64.    On September 19, 2022, Plaintiff Mena submitted a Complaint regarding Defendants'

12  failure to provide her a religious exemption to the COVID-19 vaccine, based on her sincerely held

13  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

14  immediate right-to-sue letter on September 19, 2022.

15  65.    On September 29, 2022, Plaintiff Mena filed a Government Tort Claim in support of her

16  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

17  66.    Plaintiff Mena is not required to complete the internal grievance process because her claims

18  do not involve a controversy or dispute between VTA and ATU 265 concerning the interpretation

19  or application of the CBA.

20  67.    On September 19, 2022, Plaintiff Kennedy submitted a Complaint regarding Defendants'

21  failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held

22  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

23  immediate right-to-sue letter on September 19, 2022.

24  68.    On September 29, 2022, Plaintiff Kennedy filed a Government Tort Claim in support of his

25  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

26  69.    Plaintiff Kennedy is not required to complete the internal grievance process because his

27  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

28  interpretation or application of the CBA.

70.     On September 19, 2022, Plaintiff Rodriguez submitted a Complaint regarding Defendants' failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an immediate right-to-sue letter on September 19, 2022.

71.     On September 29, 2022, Plaintiff Rodriguez filed a Government Tort Claim in support of his claim for Intentional Infliction of Emotional Distress against Defendant VTA.

72.     Plaintiff Rodriguez is not required to complete the internal grievance process because his claims do not involve a controversy or dispute between VTA and ATU 265 concerning the interpretation or application of the CBA.

73.     On September 19, 2022, Plaintiff Ruiz submitted a Complaint regarding Defendants' failure to provide him a religious exemption to the COVID-19 vaccine, based on her sincerely held religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an immediate right-to-sue letter on September 19, 2022.

74.     On September 29, 2022, Plaintiff Ruiz filed a Government Tort Claim in support of her claim for Intentional Infliction of Emotional Distress against Defendant VTA.

75.     Plaintiff Ruiz is not required to complete the internal grievance process because her claims do not involve a controversy or dispute between VTA and ATU 265 concerning the interpretation or application of the CBA.

76.     On September 19, 2022, Plaintiff Bircher submitted a Complaint regarding Defendants' failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an immediate right-to-sue letter on September 19, 2022.

77.     On September 29, 2022, Plaintiff Bircher filed a Government Tort Claim in support of his claim for Intentional Infliction of Emotional Distress against Defendant VTA.

78.     Plaintiff Bircher is not required to complete the internal grievance process because his claims do not involve a controversy or dispute between VTA and ATU 265 concerning the interpretation or application of the CBA.

79.     On September 19, 2022, Plaintiff C. Sacil submitted a Complaint regarding Defendants'

1  failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held

2  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

3  immediate right-to-sue letter on September 19, 2022.

4  80.    On September 29, 2022, Plaintiff C. Sacil filed a Government Tort Claim in support of his

5  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

6  81.    Plaintiff C. Sacil is not required to complete the internal grievance process because his

7  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

8  interpretation or application of the CBA.

9  82.    On September 19, 2022, Plaintiff Sanchez submitted a Complaint regarding Defendants'

10  failure to provide him a religious exemption to the COVID-19 vaccine, based on her sincerely held

11  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

12  immediate right-to-sue letter on September 19, 2022.

13  83.    On September 29, 2022, Plaintiff Sanchez filed a Government Tort Claim in support of her

14  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

15  84.    Plaintiff Sanchez is not required to complete the internal grievance process because her

16  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

17  interpretation or application of the CBA.

18  85.    On September 19, 2022, Plaintiff Buckley submitted a Complaint regarding Defendants'

19  failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held

20  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

21  immediate right-to-sue letter on September 19, 2022.

22  86.    On September 29, 2022, Plaintiff Buckley filed a Government Tort Claim in support of his

23  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

24  87.    Plaintiff Buckley is not required to complete the internal grievance process because his

25  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

26  interpretation or application of the CBA.

27  88.    On September 19, 2022, Plaintiff Rolland submitted a Complaint regarding Defendants'

28  failure to provide her a religious exemption to the COVID-19 vaccine, based on his sincerely held

1  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

2  immediate right-to-sue letter on September 19, 2022.

3  89.    On September 29, 2022, Plaintiff Rolland filed a Government Tort Claim in support of his

4  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

5  90.    Plaintiff Rolland is not required to complete the internal grievance process because his

6  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

7  interpretation or application of the CBA.

8  91.    On September 19, 2022, Plaintiff M. Sacil submitted a Complaint regarding Defendants'

9  failure to provide her a religious exemption to the COVID-19 vaccine, based on her sincerely held

10  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

11  immediate right-to-sue letter on September 19, 2022.

12  92.    On September 29, 2022, Plaintiff M. Sacil filed a Government Tort Claim in support of her

13  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

14  93.    Plaintiff M. Sacil is not required to complete the internal grievance process because her

15  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

16  interpretation or application of the CBA.

17  94.    On September 19, 2022, Plaintiff Poythress submitted a Complaint regarding Defendants'

18  failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held

19  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

20  immediate right-to-sue letter on September 19, 2022.

21  95.    On September 29, 2022, Plaintiff Poythress filed a Government Tort Claim in support of his

22  claim for Intentional Infliction of Emotional Distress against Defendant VTA.

23  96.    Plaintiff Poythress is not required to complete the internal grievance process because his

24  claims do not involve a controversy or dispute between VTA and ATU 265 concerning the

25  interpretation or application of the CBA.

26  97.    On September 19, 2022, Plaintiff Darby submitted a Complaint regarding Defendants'

27  failure to provide him a religious exemption to the COVID-19 vaccine, based on his sincerely held

28  religious beliefs, to the Department of Fair Employment & Housing ("DFEH"). DFEH issued an

1   immediate right-to-sue letter on September 19, 2022.

2   98.     On September 29, 2022, Plaintiff Darby filed a Government Tort Claim in support of his

3   claim for Intentional Infliction of Emotional Distress against Defendant VTA.

4   99.     Plaintiff Darby is not required to complete the internal grievance process because his claims

5   do not involve a controversy or dispute between VTA and ATU 265 concerning the interpretation

6   or application of the CBA.

7

8                                      FACTUAL ALLEGATIONS

9   100.    Defendant VTA employed Plaintiff Mena as a management analyst in the office of business

10   diversity programs from January 6, 2020, through the present.

11   101.    Defendant VTA employed Plaintiff Kennedy as a bus driver, and then as a light rail

12   operator in from January 11, 1999, through the present.

13   102.    Defendant VTA employed Plaintiff Rodriguez as a bus operator from September 4, 2019

14   through the present.

15   103.    Defendant VTA employed Plaintiff Ruiz as a bus operator from July 5, 2006, through the

16   present.

17   104.    Defendant VTA employed Plaintiff Bircher as a transit mechanic from April 11, 2011

18   through the present.

19   105.    Defendant VTA employed Plaintiff C. Sacil as a bus operator from May 1, 2013

20   through the present.

21   106.    Defendant VTA employed Plaintiff Sanchez as a bus operator department from July 27,

22   2011, through the present.

23   107.    Defendant VTA employed Plaintiff Buckley as a transit mechanic from January 7, 2013,

24   through the present.

25   108.    Defendant VTA employed Plaintiff Rolland as a transit mechanic from around 2000 until

26   he retired on June 16, 2022.

27   109.    Plaintiff Rolland retired because of Defendants' denial of his request for religious

28   exemption from their COVID-19 vaccine requirement; he would not have retired otherwise.

110.    Defendant VTA employed Plaintiff M. Sacil as a bus operator from August 25, 2015, through the present.

111.    Defendant VTA employed Plaintiff Poythress as a bus operator from January 28, 2008, through the present.

112.    Defendant VTA employed Plaintiff Darby as a light rail vehicle operator from March 2000 through the present.

113.    Plaintiffs all requested religious accommodations from Defendants COVID-19 vaccine requirements.

114.    Plaintiffs all sought to wear masks and submit to weekly testing in lieu of receiving the COVID-19 vaccine.

115.    Plaintiffs, all received communications from Defendant Shaw, demanding Plaintiffs respond to Defendants' "Religious Accommodation Verification Form."

116.    Defendants had no bona fide basis for subjecting Plaintiffs' requests for religious accommodation to additional scrutiny.

117.    On information and belief, VTA was hostile to the notion that opposition to the COVID-19 vaccine requirement, based on the use of fetal cells, could be religiously based, or sincerely held; VTA was hostile to this unpopular religious belief because they presumed it could not be legitimate, or perhaps they presumed it could not be legitimate because it was unpopular.

118.    Plaintiffs, all received communications from Defendant Shaw, demanding Plaintiffs respond to Defendants' "Religious Clarification Form" (the "Clarification Form").

119.    Defendants had no bona fide basis for subjecting Plaintiffs' requests for religious accommodation to additional scrutiny.

120.    The questions in Defendants' Clarification Form were structured in such a manner that only a theologian would have a chance of answering them in a manner that didn't provide a basis for denial.

121.    The questions in Defendants' Clarification Form were an essential component of Defendants' sham "investigation," which had a predetermined outcome – denial of requests for religious accommodation.

122.    Plaintiffs all received correspondence from Defendants titled "Interactive Process Update on COVID-19 Accommodation Request: Religious Vaccine Exemption Denial." (the "Denials").

123.    Since the Denials, Defendants have threatened Plaintiffs' livelihood in a severe and pervasive manner.

124.    On information and belief, VTA treated religiously based requests for exemption from the COVID-19 vaccine requirement, based on the use of fetal cells, less favorably than religiously based requests for exemption from the COVID-19 vaccine requirement that did not mention the use of fetal cells. VTA was hostile to the notion that a religious belief prohibiting the vaccine because of its use of fetal cells could be a religious belief, or sincerely held.

125.    On information and belief, VTA treated religiously based requests for exemption from the COVID-19 vaccine requirement, based on the use of fetal cells, less favorably than religiously based requests for accommodations other than an exemption from the COVID-19 vaccine requirement; VTA might not have been hostile to religion in general, but they were hostile to an unpopular religious belief.

126.    On information and belief, VTA treated religiously based requests for exemptions from the COVID-19 vaccine, less favorably than disability-based requests for exemption from the COVID-19 vaccine requirement; VTA was hostile to the notion that opposition to the vaccine mandate, based on the vaccine's use of fetal cells, could be religious, they accepted that opposition could be based on medical disabilities.

127.    Since Defendants enacted their COVID-19 vaccine policy, Plaintiffs have received weekly communications from Defendants stating that Plaintiffs would be terminated from their positions if they refused to receive the COVID-19 vaccine in light of their sham investigation and the pre-determined Denials.

128.    On or about May 2022, Defendants sent Plaintiffs correspondences indicating they intended to terminate Plaintiffs' employment (the "Proposed Termination Letter").

129.    On or about April 2022, Defendants sent Plaintiffs correspondences indicating they intended to place Plaintiffs on an unpaid 30-day suspension (the "Proposed Suspension Letter").

130.    On or about June 2022, Defendants informed Plaintiffs of their right to a *Skelly* hearing (the

1  "*Skelly* Hearings for Termination Letter"), in relation to Defendants' proposed termination of

2  Plaintiffs.

3  131.    On or about July 2022, Defendants informed Plaintiffs of their right to a *Skelly* hearing (the

4  "*Skelly* Hearings for Suspension Letter"), in relation to Defendants' proposed suspension of

5  Plaintiffs.

6  132.    The basis for the ever-present threat to Plaintiffs' livelihoods was their insubordination in

7  refusing to receive the COVID-19 vaccine for religious reasons.

8  133.    Plaintiffs all suffered, and continue to suffer, emotional distress as a result of Defendants'

9  egregious conduct: Defendants engaged in a systematic sham investigation, utilizing shoddy

10  questionnaires designed to provide support for the predetermined conclusion that Plaintiffs' beliefs

11  were insincere, followed by a months-long-campaign of terror where Defendants repeatedly

12  threatened Plaintiffs' livelihoods if they didn't bow to Defendants' will – the epitome of the "Mark

13  of the Beast."

14  134.    Defendants' Proposed Termination Letter stated "[A]s a condition for you to continue to

15  work between [Date] and the date that a final decision is made regarding your employment, you

16  will be required to: Test for COVID-19 on a weekly basis."

17  135.    Defendants' Proposed Suspension Letter stated "[D]ue to your noncompliance with VTA's

18  COVID-19 Vaccination Policy, you are also required to submit COVID-19 test results to [email

19  address] every Friday by 5:00 p.m."

20  136.    Thus, Defendants are estopped from asserting that the accommodations requested by

21  Plaintiffs constituted an undue burden.

22  137.    According to the Equal Employment Opportunity Commission's "What You Should Know

23  About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws," "Generally, under

24  Title VII, an employer should proceed on the assumption that a request for religious accommodation

25  is based on sincerely held religious beliefs, practices, or observances."

26  138.    According to the Equal Employment Opportunity Commission's "What You Should Know

27  About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws," "Once an

28  employer is on notice that an employee's sincerely held religious belief, practice, or observance

1   prevents the employee from getting a COVID-19 vaccine, the employer must provide a reasonable

2   accommodation unless it would pose an undue hardship."

3   139.    According to the Equal Employment Opportunity Commission's guidance on Religious

4   Discrimination," "The sincerity of an employee's stated religious beliefs, practices, or observances

5   is usually not in dispute. The employee's sincerity in holding religious belief is 'largely a matter of

6   individual credibility." (Section 12-I.A.2).

7   140.    According to the Equal Employment Opportunity Commission's "What You Should Know

8   About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws," "Although prior

9   inconsistent conduct is relevant to the question of sincerity, an individual's beliefs, or degree of

10  adherence – may change over time and, therefore, an employee's newly adopted or inconsistently

11  observed practices may nevertheless be sincerely held. An employer should not assume that an

12  employee is insincere simply because some of the employee's practices deviate from the commonly

13  followed tenets of the employee's religion, or because the employee adheres to some common

14  practices but not others. No one factor or consideration is determinative, and employers should

15  evaluate religious objections on an individual basis."

16  141.    On information and belief, an employee who is suspended for two consecutive pay periods,

17  or more, will delay the vesting of their pension for a duration equal to their suspension.

18  142.    Therefore, threats to suspend an employee for thirty days, or more, directly impacts *when* that

19  employee's pension will vest.

20  143.    Therefore, threats to suspend employees for thirty days or more are specifically designed to

21  pressure employees to capitulate to VTA's demands by depriving that employee of 30-days' pay and

22  forcing the employee to work an additional period of time in order to receive their pensions; VTA is

23  well aware of this fact.

24  144.    In their February 28, 2022, "Religious Clarification Form #2," which Defendants provided to

25  Plaintiff Rodriguez, Defendants conceded that the COVID-19 vaccines utilize fetal cells; in bold,

26  highlighted print, Defendants stated, "Santa Clara VTA recognizes that fetal cells are used in the

27  development and testing of COVID-19 vaccines…"

28  145.    Neither Defendant VTA, nor Defendant Shaw, asked what accommodation Plaintiffs were

1  seeking at any point during the process; Defendants were more interested in an inquisitorial-styled
2  approach where they bombarded Plaintiffs with questions designed to find cracks in Plaintiffs' belief
3  systems so they could point to those cracks as a reason for denying Plaintiffs' requests for religious
4  exemption from VTA's COVID-19 vaccine requirement.

5  146.    In May 2021, a VTA employee murdered 9 co-workers, all of whom were "light rail
6  workers."

7  147.    VTA's "light rail worker" division became difficult to staff partially due to the mass shooting,
8  and partially to the difficulty of training employees for the position.

9  148.    The "light rail worker" division was responsible for the daily inspection of the light rail lines,
10  and the light rail could not operate until those inspections, and repairs, if necessary, were complete.

11  149.    On information and belief, VTA approved most of the *timely* requests for religious exemption
12  from the vaccine requirements because of the difficulty of replacing employees in the "light rail
13  worker" department.

14  150.    On information and belief, Defendants never questioned the sincerity of the light-rail
15  workers' applications for religious exemption from their COVID-19 vaccine requests.

16  151.    On information and belief, VTA essentially rubber stamped the "light rail worker's" requests
17  for religious exemption from their vaccine requirements out of concern that they would be unable to
18  adequately staff the department. This lends support to the notion that VTA rejected Plaintiffs'
19  exemption requests out of a hostility to the notion that opposition to the COVID-19 vaccine could be
20  religiously based or sincerely held, rather than a sincerely held belief on VTA's part that the vaccine
21  was necessary to their operations.

22  152.    Alternatively, VTA instructed Shaw to rubber stamp the "light rail workers'" requests for
23  religious exemption from their vaccine requirements out of concern that they would be unable to
24  adequately staff the department.

25  153.    On June 17, 2022, Santa Clara County Sheriff Transit Deputies arrested Douglas Lofstrom,
26  a VTA employee, who had made threats of gun violence against his employers.

27  154.    On information and belief, Mr. Lofstrom's request for a religious exemption from VTA's
28  COVID-19 vaccine requirement had recently been denied.

155.     VTA had received numerous requests, including from Union President John Courtney, to cease placing undue pressure on employees by threatening to terminate those who remained unvaccinated, including those who based their refusal on religious grounds.

156.     VTA's conduct has morphed the situation from a vaccination crisis into a mental health crisis.

157.     On or about June 17, 2022, VTA cancelled the *Skelly* hearings, discussed below, which were being held to determine whether or not employees who had refused the COVID-19 vaccine on religious grounds, but were ultimately denied after a legally questionable process, would be terminated from their positions.

158.     On or about July 5, 2022, a member of ATU 265 committed suicide.

159.     The services for that employee were held on July 11, 2022, and July 12, 2022.

160.     VTA had scheduled *Skelly* hearings, to determine whether or not to suspend Plaintiffs for 30 days, between July 11, 2022, and July 15, 2022.

161.     Because ATU 265 president, John Courtney, would be unable to appear on behalf of Plaintiffs on July 11, 2022 and July 12, 2022 because he was attending the services, VTA postponed the *Skelly* hearings on July 11, 2022, and July 12, 2022.

162.     Subsequently, Defendants determined that Plaintiffs would be placed on an unpaid suspension for their insubordination in refusing to receive the COVID-19 vaccine for religious reasons, while requesting to test weekly as an accommodation.

163.     Plaintiffs were instructed that when they returned from their suspension, they would be required to test weekly in lieu of receiving the COVID-19 vaccine.

**FIRST CAUSE OF ACTION**

**Violation of FEHA – Religious Discrimination**

**By all Plaintiffs Against All Defendants**

164.     Plaintiff incorporates by reference the paragraphs above.

165.     At all times herein mentioned, California Government Code §12900 et seq., the Fair Employment and Housing Act ("FEHA"), was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

166.    Under the FEHA, Government Code section 12900 et. Seq., it is an unlawful employment practice for an employer because of a person's religion, religious creed, religious beliefs, religious practices, or religious observances, to refuse to hire or employ the person, to refuse to select the person for a training program leading to employment, or to discriminate against the person I compensation or in terms, conditions, or privileges of employment.

167.    By, *inter alia*, refusing to engage in the interactive process to permit Plaintiffs to establish their sincere religious beliefs, by wrongfully denying them any religious accommodation or exemption to Defendants' COVID-19 vaccine mandate without any legitimate reason for doing so, and then by suspending Plaintiffs without justification, Defendants discriminated against Plaintiffs based on their sincerely held religious beliefs with respect to the terms conditions and privileges of employment.

168.    Defendants have unlawfully discriminated against Plaintiffs by suspending them for the exercise of her religious beliefs.

169.    Plaintiffs have a bona fide and sincerely held religious belief that precludes them from obtaining any of the COVID-19 vaccines.

170.    Plaintiffs' sincerely held religious beliefs conflict with Defendants' policies that require them to receive the COVID-19 vaccine.

171.    Plaintiffs raised their sincerely held religious beliefs with Defendants, brought their objections and requests for religious accommodations and exemptions to Defendants' attention, and requested religious exemptions and accommodations from the COVID-19 vaccine requirement.

172.    Defendants' suspension of Plaintiffs' employment was motivated by, and is the result of, the exercise of their sincerely held religious beliefs.

173.    Defendants lacked any justification for the adverse employment action taken against Plaintiffs, as the mechanism they used to determine the sincerity of Plaintiffs' religious beliefs were designed to allow them to reject those requests without any oversight; the questions were designed to be ambiguous enough that it would elicit a response they could use to justify rejection after-the-fact.

174.    As a proximate result of the aforesaid acts of Defendants, Plaintiffs have suffered actual

1  harm, in an amount subject to proof at the time of trial.

2  175.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered and

3  continues to suffer emotional distress, humiliation, mental anguish, and embarrassment.

4  176.    As a proximate act of the wrongful acts of Defendants, Plaintiffs have been forced to hire

5  attorneys to prosecute their claims herein and has incurred and is expected to incur attorneys' fees

6  and costs in connection therewith. Plaintiff is entitled to recover attorneys' fees and costs under

7  California Government Code §12965(b).

8  177.    Plaintiffs are entitled to other such relief as this court deems appropriate.

9

10                          **SECOND CAUSE OF ACTION**

11    **Violation of FEHA – Failure to Take All Reasonable Steps Necessary to Prevent**

12                          **Discrimination from Occurring**

13                       **By All Plaintiffs Against All Defendants**

14  178.    Plaintiff incorporates by reference the paragraphs above.

15  179.    It is unlawful under California Government Code section 12900, et. Seq., for an employer

16  to fail to take all reasonable steps necessary to prevent discrimination and harassment based on an

17  employee's religion, or that religion's creed, beliefs, practices, or observances.

18  180.    the questions included in the Additional Information Letter were designed to elicit

19  ambiguous responses that would allow them to reject any request for religious accommodation

20  without any oversight.

21  181.    Defendants knew, or should have known, that the questions presented in the Additional

22  Information Letter could not be answered in a satisfactory manner by anyone other than a

23  theologian; a lay person could not possibly understand the nuances and intricacies of the Church's

24  position on the COVID-19 vaccine, nor could they be expected to convey those nuances and

25  intricacies in their own words.

26  182.    Defendants knew, or should have known, that the questions presented in the Additional

27  Information Letter would have the net effect of wrongly denying a substantial number of requests

28  for religious exemption and accommodations.

183.   Notwithstanding this knowledge, Defendants required Plaintiffs to answer these questions, and rejected their requests for religious accommodations or exemptions, nonetheless.

184.    As a proximate result of the aforesaid acts of Defendants, Plaintiffs have suffered actual harm, in an amount subject to proof at the time of trial.

185.   As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered and continues to suffer emotional distress, humiliation, mental anguish, and embarrassment.

186.   As a proximate act of the wrongful acts of Defendants, Plaintiffs have been forced to hire attorneys to prosecute their claims herein and has incurred and is expected to incur attorneys' fees and costs in connection therewith. Plaintiff is entitled to recover attorneys' fees and costs under California Government Code §12965(b).

187.   Plaintiffs are entitled to other such relief as this court deems appropriate.

### THIRD CAUSE OF ACTION

### Violation of FEHA – Retaliation for Requesting Religious Accommodation

### By All Plaintiffs Against All Defendants

188.   Plaintiff incorporates by reference the paragraphs above.

189.   Government Code §12940(h) prohibits an employer from retaliating against an employee for opposing practices that violate their right under FEHA.

190.   Plaintiffs had a right to refuse to comply with Defendants COVID-19 vaccine requirement on religious grounds.

191.   Plaintiffs had a right to request, and receive, religious accommodations, based on their sincerely held religious beliefs, from Defendants' COVID-19 requirement.

192.   Plaintiffs requested to test weekly in lieu of receiving the COVID-19 vaccine, which conflicted with their religious beliefs.

193.   Ultimately, Defendants determined that weekly testing was an acceptable alternative to receiving the COVID-19 vaccine, but suspended Plaintiffs for their insubordination; a dog whistle for invoking their religious rights.

194.   As a proximate result of the aforesaid acts of Defendants, Plaintiffs have suffered actual

1  harm, in an amount subject to proof at the time of trial.

2  195.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered and

3  continues to suffer emotional distress, humiliation, mental anguish, and embarrassment.

4  196.    As a proximate act of the wrongful acts of Defendants, Plaintiffs have been forced to hire

5  attorneys to prosecute their claims herein and has incurred and is expected to incur attorneys' fees

6  and costs in connection therewith. Plaintiff is entitled to recover attorneys' fees and costs under

7  California Government Code §12965(b).

8  197.    Plaintiffs are entitled to other such relief as this court deems appropriate.

9

10  **FOURTH CAUSE OF ACTION**

11  **Violation of FEHA – Failure to Take All Reasonable Steps Necessary to Prevent Retaliation**

12  **from Occurring**

13  **By All Plaintiffs Against All Defendants**

14  198.    Plaintiff incorporates by reference the paragraphs above.

15  199.    It is unlawful under California Government Code section 12900, et. Seq., for an employer

16  to fail to take all reasonable steps necessary to prevent retaliation and harassment based on an

17  employee's religion, or that religion's creed, beliefs, practices, or observances.

18  200.    Defendants knew, or should have known, that suspending Plaintiffs for invoking their

19  religious rights flew in the face of FEHA.

20  201.    This is true regardless of how Defendants choose to frame the crime they are punishing;

21  here, Defendants choose to say they are punishing insubordination.

22  202.    Because Plaintiffs' "insubordination" amounts to the invocation and advocacy of, their

23  religious rights, Defendants' decision to suspend them constitutes retaliation under FEHA.

24  203.    As a proximate result of the aforesaid acts of Defendants, Plaintiffs have suffered actual

25  harm, in an amount subject to proof at the time of trial.

26  204.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered and

27  continues to suffer emotional distress, humiliation, mental anguish, and embarrassment.

28  205.    As a proximate act of the wrongful acts of Defendants, Plaintiffs have been forced to hire

1  attorneys to prosecute their claims herein and has incurred and is expected to incur attorneys' fees

2  and costs in connection therewith. Plaintiff is entitled to recover attorneys' fees and costs under

3  California Government Code §12965(b).

4  206.    Plaintiffs are entitled to other such relief as this court deems appropriate.

5

6  **FIFTH CAUSE OF ACTION**

7  **Retaliation in Violation of Labor Code §6310**

8  **By All Plaintiffs Against All Defendants**

9  207.    Plaintiff incorporates by reference the paragraphs above.

10  208.    Labor Code §6310 prohibits an employer from discharging or discriminating against an

11  employee because the employee has made any oral or written complaint, regarding employee safety

12  or health, to their employer.

13  209.    In the present case, after Defendants' wrongful rejection of Plaintiffs' requests for religious

14  accommodations and exemptions from Defendants' COVID-19 vaccine requirement, Plaintiffs

15  complained orally and in writing, that Defendants had behaved improperly as it related to their

16  religious rights.

17  210.    Defendants suspended Plaintiffs for their insubordination.

18  211.    Defendants conduct was willful, and malicious, and therefore subjects them to punitive

19  damages.

20  212.    Plaintiff's supervisor became openly hostile towards Plaintiff.

21  213.    Plaintiff, and any reasonable person in his position, would feel they had no reasonable

22  alternative but to resign if they wanted to make a wage they could survive on.

23  214.    Plaintiff resigned on November 20, 2020, in part, because he was unable to make a liveable

24  wage after Defendants retaliated against him and reduced his schedule to five (5) hours per

25  workweek.

26  215.    Plaintiff suffered harm, in the form of lost income, because of Defendants' conduct.

27  216.    Therefore, Defendants constructively discharged Plaintiff in violation of Labor Code

28  section 6310.

**SIXTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**By All Plaintiffs Against All Defendants**

217.    Plaintiff incorporates by reference the paragraphs above.

218.    The conduct of Defendants, as set forth above, was so extreme and outrageous that it exceeded the boundaries of a decent society and lies outside the compensation bargain.

219.    Said conduct was intended to cause Plaintiff severe emotional distress or was done in conscious disregard of the probability of causing severe emotional distress. Said conduct was also in direct violation of California law and public policy.

220.    As a proximate result of the wrongful conduct of Defendants, Plaintiffs have sustained substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

221.    As a further proximate result of the wrongful conduct of Defendants, Plaintiff have suffered and continue to suffer humiliation, embarrassment, sever emotional distress, and mental anguish, all to Plaintiff's damage in an amount according to proof at the time of trial.

222.    In doing all the acts herein alleged, Defendants, through their managing agents, acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff. Therefore, Plaintiff is also entitled to punitive damages in an amount according to proof at the time of trial.

**SEVENTH CAUSE OF ACTION**

**Declaratory and Injunctive Relief for Violations of the Religious Freedom Restoration Act ("RFRA")**

**By All Plaintiffs Against All Defendants**

223.    Plaintiff incorporates by reference the paragraphs above.

224.    Plaintiffs bring this cause of action pursuant to the Religious Freedom Restoration Act; 42 U.S.C. 2000bb.

225.    The Religious Freedom Restoration Act prevents the Santa Clara VTA from substantially burdening a person's exercise of religion even if the burden results from a rule of general

SECOND AMENDED COMPLAINT

1    applicability.

2    226.    Religious Freedom includes the liberty to engage in acts mandated by religious beliefs, as

3    well as the liberty to *refuse* to engage in conduct that their sincerely held religious beliefs prohibit.

4    227.    Plaintiffs were repeatedly threatened with consequences if they refused to capitulate and

5    receive the COVID-19 vaccine, thereby receiving the "mark of the beast."

6    228.    Thus, Defendant attempted to coerce Plaintiffs into engaging in acts strictly prohibited by

7    their sincerely held religious beliefs.

8    229.    As a direct, foreseeable, and proximate result of this constitutional violation, Plaintiffs have

9    sustained, or are likely to sustain injuries and damages including but not limited to loss of property,

10   loss of economic opportunities, and other economic losses, the total amount of which is to be

11   determined at time of trial.

12   230.    Plaintiffs pray for judgment and damages, as more fully set forth below.

13

14                                          **<u>PRAYER</u>**

15

16   First Cause of Action

17   1. Lost wages;

18   2. Future earnings;

19   3. General damages in the amount of $1,000,000.00;

20   4. Attorneys' fees;

21   5. Costs; and

22   6. Other relief the court deems proper.

23

24   Second Cause of Action

25   1. Lost wages;

26   2. Future earnings;

27   3. General damages in the amount of $1,000,000.00;

28   4. Attorneys' fees;

5. Costs; and

6. Other relief the court deems proper.

Third Cause of Action

1. Lost wages;

2. Future earnings;

3. General damages in the amount of $1,000,000.00

4. Attorneys' fees;

5. Costs; and

6. Other relief the court deems proper.

Fourth Cause of Action

1. Lost wages;

2. Future earnings;

3. General damages in the amount of $1,000,000.00;

4. Attorneys' fees;

5. Costs; and

6. Other relief the court deems proper.

Fifth Cause of Action

1. Future earnings;

2. Lost wages;

3. Interest;

4. Punitive damages;

5. Attorneys' fees;

6. Costs; and

7. Other relief the Court deems proper.

///

SECOND AMENDED COMPLAINT

1  Sixth Cause of Action

2  1. Emotional distress.

3  2. Attorneys' fees;

4  3. Costs;

5  4. Punitive damages; and

6  5. Other relief the Court deems proper.

7

8  Seventh Cause of Action

9  1. Future earnings;

10  2. Lost wages;

11  3. Interest;

12  4. Punitive damages;

13  5. Attorneys' fees;

14  6. Costs;

15  7. Injunctive Relief;

16  8. Declaratory Relief; and

17  9. Other relief the Court deems proper.

18

19

20  Date:   May 1, 2023                    FRONTIER LAW CENTER

21

22                                    /s/ *Joseph Gross*
                                      Joseph Gross
23                                    Attorney for Plaintiff
                                      MARINO JAIR RODRIGUEZ, et al.

24

25

26

27

28

SECOND AMENDED COMPLAINT